IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AT SAN ANTONIO

CHRISTUS HEALTH SYSTEMS, INC., and
CHRISTUS SANTA ROSA HEALTH CARE
CORPORATION,                                    No. SA:12-CV-01221-DAE

                              Plaintiffs,
                                                San Antonio, TX
vs.                                             August 29th, 2014

AMERICAN CONSULTANTS RX, INC.,
AMERICAN CONSULTANTS, INC., and
CHARLES MYRICK,

                              Defendants.

         TRANSCRIPT OF SHOW CAUSE HEARING PROCEEDINGS
              BEFORE THE HONORABLE DAVID A. EZRA
              SENIOR UNITED STATES DISTRICT JUDGE

                         APPEARANCES

APPEARING FOR THE PLAINTIFFS:

     Mr. Marc B. Collier &
     Mr. Robert L. Rouder
     Fulbright & Jaworski, LLP
     98 San Jacinto Boulevard
     Suite 1100
     Austin, Texas  787014-4255
     512-474-5201
     marc.collier@nortonrosefulbright.com
     robert.rouder@nortonrosefulbright.com

DEFENDANT CHARLES MYRICK APPEARS PRO SE.


COURT REPORTER:

     Kristin M. Anderson, RPR
     United States Court Reporter
     655 E. Cesar E. Chavez Blvd.
     San Antonio, TX 78206
     210-244-5048
     kristin_anderson@txwd.uscourts.gov


Proceedings reported by stenotype, transcript produced by
computer-aided transcription.

INDEX

PLAINTIFF'S WITNESSES                                    Page

  Charles Myrick

     Direct Examination by Mr. Collier          4

DEFENDANT'S WITNESSES

  None

EXHIBITS

PLAINTIFF'S EXHIBITS          IDENTIFIED   OFFERED   RECEIVED

  1      Document            8

DEFENDANT'S EXHIBITS          IDENTIFIED   OFFERED   RECEIVED

  None

.

1          COURTROOM DEPUTY:  *CHRISTUS Health Systems,*

2  *Incorporated, et al., vs. American Consultants RX,*

3  *Incorporated, et al.,* SA:12-CV-1221.

4          THE COURT:  All right.  May I have appearances,

5  please.

6          MR. COLLIER:  Your Honor, this is Marc Collier, of

7  Norton, Rose, Fulbright, along with counsel Bob Rouder, also of

8  Norton, Rose, Fulbright, on behalf of CHRISTUS Santa Rosa and

9  CHRISTUS Health.

10          THE COURT:  All right.  And, sir?

11          DEFENDANT CHARLES MYRICK:  My name is Charles Myrick.

12  I'm the president and CEO of American Consultants RX,

13  Incorporated.

14          THE COURT:  All right.  Well, I'm glad to see you

15  here, Mr. Myrick.  Because, had you not shown up today, I would

16  have issued a federal bench warrant for your arrest.  And you

17  would have come here, but you would have come here under

18  arrest.  Do you understand that?

19          DEFENDANT CHARLES MYRICK:  Oh, yes, sir.

20          THE COURT:  All right.

21          DEFENDANT CHARLES MYRICK:  I decided last night I

22  should come.

23          THE COURT:  That was probably a pretty good idea

24  because it might have taken the marshals two or three weeks to

25  get you here.  And, during that period of time, you would have

1  been housed in a series of federal detention facilities between

2  here and where you live.  It would not have been a pleasant

3  experience.

4      All right.  You want to move forward, sir?

5          MR. COLLIER:  Yes, Your Honor.  At this time,

6  CHRISTUS would like to call Charles Myrick to the witness

7  stand.

8          THE COURT:  Mr. Myrick.

9          COURTROOM DEPUTY:  Come right over here.

10     Before you have a seat, if would you please raise your

11  right hand.

12                 (Witness sworn.)

13         COURTROOM DEPUTY:  Thank you.  You may have a seat.

14         MR. COLLIER:  Your Honor, may I question from the

15  desk?  We may need the computer at various times.

16         THE COURT:  All right.

17         MR. COLLIER:  Thank you.

18                 CHARLES MYRICK,

19  being first duly sworn, testified under oath as follows:

20                 DIRECT EXAMINATION

21  BY MR. COLLIER:

22  Q. Good afternoon.  Mr. Myrick, will you please state your full

23  name.

24  A. Well, I go by Charles Myrick, but my name is Charlie Myrick,

25  Charlie L. Myrick, Jr., but everyone -- since I was -- I always

1  go by Charles L. Myrick, Jr.

2  Q. And what does the "L" stand for?

3  A. Lee.

4  Q. And where do you currently reside?

5  A. 2900 Camp Creek Parkway, Atlanta, Georgia -- I mean

6  College Park --

7           THE REPORTER:  Say that again.

8           THE WITNESS:   2900 Camp Creek Parkway, and that's

9  College Park, Georgia, 30337.

10  BY MR. COLLIER:

11  Q. And is that Suite D-13 --

12  A. Right.

13  Q. -- or Apartment D-13?

14  A. Apartment D-13, right.

15  Q. And you both live and operate your companies out of that

16  address?

17  A. Yes.  The program was actually built into the inner city,

18  yes.

19  Q. And are you able to receive mail at that address?

20  A. Yes, I am.

21  Q. What is the last four of your Social Security Number?

22  A. 6031.

23  Q. And your birthday?

24  A. 10-20-65.

25  Q. And, finally, where were you born?

1  A. Kansas City, Missouri.

2  Q. Do you understand that I represent CHRISTUS Santa Rosa and

3  CHRISTUS Health in this matter?

4  A. Oh, yes, I do.

5  Q. And have you seen my name, Marc Collier, and Mr. Rouder's

6  name on the pleadings that you've received in this case?

7  A. I have.

8  Q. At any time have you contacted myself, Mr. Rouder, or anyone

9  at Norton, Rose, Fulbright regarding this case?

10  A. Not me personally.  I -- I think my attorney contacted

11  CHRISTUS, and I contacted CHRISTUS myself at the -- the

12  hospital.

13  Q. On what date?

14  A. I -- I can't remember what the date was.

15  Q. Years ago?

16  A. Excuse me?

17  Q. Years ago?

18  A. Concerning this case, is that what you're asking?

19  Concerning this case or --

20          MR. COLLIER:  May I approach?

21          THE COURT:  Yes.

22  BY MR. COLLIER:

23  Q. Mr. Myrick, is this a letter you received in 2012 from

24  CHRISTUS Health asking you to cease and desist using their

25  trademarks?

1   A. I can't really remember because it would have gone to my

2   attorney once --

3   Q. Were there -- were there two addressees on there,

4   Mr. Myrick?

5   A. But you have Mr. Winston Denmark, Esquire.

6   Q. Are you addressed on there?

7   A. Yes, I am.

8   Q. Do you receive mail at that address?

9   A. Yes, I do.  But my attorney handles everything for my legal.

10  Q. Okay.  Where is your attorney now?

11  A. He's in Georgia.

12  Q. Does he represent you in this matter?

13  A. He will -- when it comes to Georgia, he will.

14  Q. Were you aware in 2012, either through the receipt of that

15  letter, or through your counsel, that CHRISTUS Health and

16  CHRISTUS Santa Rosa opposed your use of their trademarks?

17  A. Oh, I did hear a concern, yes.

18  Q. Okay.  Are you aware, sir, that on March 27th, 2014, this

19  Court entered a permanent injunction against American

20  Consultants RX, Inc., American Consultants, Inc., and, you,

21  yourself, Charles Myrick?

22  A. We did see -- we did see it, and that's where the problem

23  was.

24  Q. Understood.  So you were aware on or about March 27th of

25  2014 of this order?

1  A. My attorney was when he looked at it, and he informed me

2  that there was a problem.

3  Q. Okay.  And, in fact, do you recall me having a process

4  server personally serve you with a copy of this permanent

5  injunction against you?

6  A. You sent me a copy of an injunction.  That was actually

7  after going through it with my attorney and several other

8  aspects in Georgia, we saw that there were some problems and

9  that it needed to be addressed.

10         THE COURT:  Who is this attorney you keep referring

11  to?  What is his name?

12         THE WITNESS:  Oh, his name is Winston Denmark.

13         THE COURT:  Mr. Winston Denmark?

14         THE WITNESS:  Right.  And that's in Atlanta, Georgia.

15  That's --

16         THE COURT:  All right.  You may proceed.

17  BY MR. COLLIER:

18  Q. Mr. Myrick, look at the last page of Exhibit 1.

19  A. Okay.

20  Q. Do you see there an envelope addressed to your attorney that

21  he refused?

22  A. I wasn't aware of this.

23  Q. And your attorney has made no appearance here today --

24  A. But he's not --

25  Q. -- correct?

1   A. -- licensed in Georgia -- I mean in -- in Texas.

2   Q. Okay.  As we sit here today, Mr. Myrick, have you removed

3   from all of the -- well, let me ask just a few more questions.

4       Is there any other employees of AC, Incorporated, the

5   defendant?

6   A. I mean we have other -- we have other individuals that work

7   with us, and we are subbed out to a lot of our -- a lot of our

8   people that work, they're independent contractors.  So, I mean,

9   they don't -- they're not necessarily employees.  They're

10  independent contractors that happen to work in the field.

11  Q. Okay.  Are you the only employee of American

12  Consultants, Inc.?

13  A. Well, I'm the only CEO, the president of the company, yes.

14  But we have nothing but independent contractors since basically

15  the program is basically built to -- each one of the guys that

16  work with us have their own numbers, have their own networks

17  that they work with individually.  The network that is working

18  on this one, the nationwide humanitarian project, that we have

19  in over 50,000 organizations, utilizes a lot of people that we

20  have to tap into.

21  Q. Are there any other employees of American Consultants

22  RX, Inc.?

23  A. Oh, we've got Dorothy Weathers.  We have -- Alvin Collins

24  has his own, but he's independent.  Angie Collins has her own

25  program.  I mean they're all independents, but they -- we all

1   work together.

2   Q. Okay.  And you have filed a response in the last day or so

3   talking about the organizations in your financial status.  What

4   does it cost to run American Consultants, Inc.?  What are the

5   expenses every year?

6   A. Oh, the expenses -- the expenses can vary to a couple

7   hundred thousand dollars, whatever I can get to keep the

8   program running.  The way our program is based and set -- it's

9   designed -- it's a system that was designed to basically never

10  have to ask for federal help, never have to ask for state help.

11  And, basically, I put the money up.  And over the course of the

12  time of ten years, we probably put -- we put over a couple of

13  million dollars into it.  So that it is actually designed to

14  run by itself.  So 85 percent of any money that I have goes

15  back into the program.

16  Q. Right.  So give the Judge your best estimate of the

17  operating cost of American Consultants, Inc., for 2013.

18  A. I think the operating might have been, maybe, 100, 150,000,

19  something like that.

20  Q. What about the cost of American Consultants RX, Inc.?

21  A. I mean American Consultants RX.  That's what I was talking

22  about.  American Consultants, the problem that we are having,

23  with your situation, is you wrote American Consultants,

24  Incorporated.  American Consultants, Incorporated, is totally

25  separate from this.  It's a -- it is a total separate entity,

1   and it's all about insurance.  We don't write insurance right

2   now.  There is no insurance written.  And you grope and group

3   everything together which was another difficulty.  American

4   Consultants, Incorporated, is totally separate.  If you go to

5   the website, it's only going to speak about insurance.  We

6   don't sell anything, like insurance, to our clientele.

7   Q. All right.  Mr. Myrick, my question is:  What were the

8   expenses that American --

9   A. I just told you.  There is no insurance.  There's nothing.

10  There's nothing coming.  We don't sell anything right now for

11  the insurance because everything that we're doing right now --

12  American Consultants, Incorporated, was actually torn apart so

13  that this program could run, the American Consultants RX could

14  run.  In order for me to do 50 million cards, I had to get the

15  money somewhere.  And nobody was going to help us.  So I gave

16  everything up so that the program could run.

17  Q. Okay.  And --

18  A. I mean -- make sure you understand something.  This is my

19  401(k).  This is my retirement money.  This is everything, and

20  I put it back into the program.

21  Q. Okay.  Sir, I'm just asking:  How much money --

22  A. No, I'm asking -- I'm telling you -- I'm explaining to

23  you --

24          THE COURT:  Mr. Myrick, you just need to --

25          THE WITNESS:  Yeah.

1    THE COURT:  -- not answer until he poses a question,

2   and then just simply answer the question.

3   BY MR. COLLIER:

4   Q. Okay.  And so the revenues received by American

5   Consultants RX are generated through a variety of click

6   referral systems, including Linksynergy; right?

7   A. Is that a question you're asking me?

8   Q. Yes.

9   A. We utilize, ideal for marketing, advertising pieces that can

10  help us subsidize some of the costs because we never charge the

11  clients anything.  So, yes, I use linkage -- what do they call

12  it, LinkShare, Commission Junction, Amazon.com, just like

13  anything -- if you look at *Huffington Post*, you'll see the same

14  thing.

15  Q. All right.  Just so we -- I want to understand how the

16  revenue comes in, and how the revenue goes out in terms of your

17  claim of having no resources, sir.

18    You are --

19  A. Well --

20  Q. -- you are receiving, are you not, approximately $400,000 in

21  revenue a year through your websites, your Tweets, and your

22  using these videos to sell goods; correct?

23  A. No, you've got it -- you've got it wrong.  I don't earn that

24  kind of money.  I don't know where you got that from.  I don't

25  earn that kind of money.  That was -- the concept of what we

1  built on this, of the Tweets, where you're talking about

2  Tweets, this is a news network that we built from 2008 of a

3  document that I gave to everyone, gave to you, of what I sent,

4  and the Congressional Black Caucus asked me, what can we do to

5  help build the disparity.  And I said, well, we have to build a

6  network that they can find.  And that's what -- this is what

7  it's coming from, we had to build a inner-based system that

8  anybody could find, and we had to build information that they

9  can go through where they're using video to educate them, where

10 they're using tips and keep elements that could help them.

11 Now, that's what it was built like.

12 Q. Mr. Myrick, I promise you the Judge will give you an

13 opportunity to explain why you do what you do.  I'm just asking

14 some very short questions.

15      Is your -- do you have a variety of Twitter accounts?  A

16 whole series of aliases under which you Tweet?

17 A. For American Consultants RX, ACRX?

18 Q. Yeah.

19 A. Yes.

20 Q. All right.

21 A. I mean for our company, yeah.

22 Q. I would ask you to look at the screen, and, for the purposes

23 of the record, we are at https.twitter.com/medicine.help.

24 A. Okay.

25 Q. Is this you, sir?

1 A. Oh, yes.  It's a -- it's a news feed.

2 Q. It's a news feed.  Read to the Court the first post posted

3 15 hours ago.

4 A. Okay.  It's Gerber baby boys mittens four pack.  Okay.  We

5 build a health site, and we build new sites.  We build

6 information sites for where they can get tips of different

7 things they can buy.  95 percent of our clientele are women,

8 and so we try to find them things that they can help them.

9 It's just information.  And if they want to get something, they

10 can.  If they don't, they don't have to.

11 Q. And, sir, if -- if the person was to click on your link

12 there --

13 A. Uh-hum.

14 Q. -- for the Gerber baby boys mittens or the Once Upon a

15 Christmas Night, or any of these things that you're Tweeting

16 every hour --

17 A. Yes.

18 Q. -- you receive payment; correct?

19 A. No, the company would.

20 Q. The company --

21 A. American Consultants --

22 Q. -- ACRX?

23 A. American Consultants RX.

24 Q. Of which you're the only employee; correct?

25 A. Yeah, I guess you could say --

1  Q. And --

2  A. -- I'm the only employee right now, yes.

3  Q. You receive all of the revenues of that company?

4  A. No, I don't.

5  Q. You receive all the revenues other than which you pour back

6  into --

7  A. No --

8  Q. -- your marketing --

9  A. -- let me explain something.  I'm at a loss.  You're asking

10  me a question, and I'm telling you.  I only make $12,000.  I

11  don't make any money.  I gave this back to the community.

12  Q. Since you've received the Court's permanent injunction, have

13  you removed, from all the defendants' websites, all references

14  to CHRISTUS or CHRISTUS Health?

15  A. No.

16  Q. Okay.  Are you aware that in Paragraph 6 of the order you

17  were ordered to do so?

18  A. Yes.

19  Q. Okay.  And --

20  A. And are you asking me, is there a reason -- do you want me

21  to tell you a reason why we haven't done it?

22  Q. Sure.

23  A. The reason why we haven't done it is because the order was

24  based on fraud.  I went through -- not only did we go through

25  Winston Denmark, but we wanted to check through the different

points from the FBI because when you wrote those things about me, you actually created fraud. You actually put me under the situation where I'm no longer a civil case. It's a criminal case. Because you questioned my integrity and the fact of the point of -- of what I was doing, and you called me out as being a fraud, at that point, injunction, when you did that, I had to self-report myself, telling them that this is what was happening.

And, at that point and juncture, from the governor's office, who granted me a pardon, who you -- which you didn't -- I guess you didn't realize, from the insurance commissioner, which I have to go through due diligence. Even though they gave me a federal waiver, I now have to self-report that there was a claim against me made concerning my integrity. I have to report to the FBI because I have federal and state agencies across the country -- and because I have so many politicians that are plugged into it that now their name is attached to something that, thanks to you, this is online right now, that has got me out there looking crazy.

On top of that, I've got the Justice Department that I've got to talk to, which is -- Judge, this is the reason why I was held a little later from coming up here. And all of these different things, which you saw on the back of my complaint -- I mean my -- my response, the things that I have to do. Because, when you have a pardon, and you have a federal waiver,

1  you have responsibilities, plus I'm licensed in the State of

2  Georgia, and they do not tolerate fraud.  And, from what you

3  described in there, what you said about me being

4  misrepresenting -- misrepresenting CHRISTUS, I had to

5  self-report that and tell them that I have to ask for an

6  investigation into myself as well as CHRISTUS.

7       And that's what has been holding up everything right now.

8  They don't want me to touch nothing until they give me the

9  okay.  I'm in Georgia, and they can put me in jail quickly.

10  They can restrict everything I have.  And if they tell me to

11  stop it so they can go through the due diligence, they put me

12  into a very unique situation.  But, of course, Mr. Collier, you

13  didn't know that I guess in all the times that you was digging

14  up my information, you didn't know I had a federal waiver and a

15  pardon and how much stress that I'm under.

16  Q. Mr. Myrick, have you removed from third-party websites, as

17  of today's date, all of your videos that reference CHRISTUS

18  Santa Rosa Children's Hospital receiving tribute and free

19  medicine help by Charles Myrick of ACRX?

20  A. I just explained that we haven't removed anything.  And also

21  to the point of your claim, you said that we did not have

22  jurisdiction, and you was lying.  Because I was able to show

23  that we had the jurisdiction, that we had the people from your

24  place that ordered the cards.  This is the thing that is

25  holding me up in Georgia because the question was asked to me,

1  did CHRISTUS order these cards, and do you have documentation

2  about it.  Yes.  Wait till they come to -- come to Georgia.

3  They're waiting for you.  That's what we've been waiting on,

4  waiting for him to come to Georgia with the Court's order so

5  that Georgia can now act.

6  Q. Mr. Myrick, I promise I just have a -- a few questions, and,

7  at the end, I will ask --

8          MR. COLLIER:  Your Honor, I will ask him an

9  open-ended question, but I'm trying to --

10          THE COURT:  No, he's already established that he

11  hasn't removed it.  He's giving us the reasons.  I'm not

12  seeing --

13          MR. COLLIER:  Okay.

14          THE COURT:  -- any further need for any additional

15  questions.

16          MR. COLLIER:  I -- I will pass the witness and let

17  Mr. Myrick or -- or the Court question, however you see fit --

18          THE COURT:  Do you have anything else you would like

19  to add, Mr. Myrick, other than what you've already responded

20  to?

21          THE WITNESS:  Yes, I would like to add a few things.

22          THE COURT:  All right.

23          THE WITNESS:  The establishment of working with

24  CHRISTUS, the way our program works, you have to request the

25  cards.  You have to send it to us in writing, or you have to

1  call us, or you have to do it online.  And the point is we have

2  a check and balance system.  And that check and balance system,

3  which I've showed, is that we were able to pull the request

4  that came from CHRISTUS that you never asked us the question

5  about who ordered the cards.  It was always assumed that we did

6  not have any authorization to work with CHRISTUS, but we've

7  been working with CHRISTUS since 2005.

8       As a matter of fact, we have almost 35 -- almost 35 or

9  40,000 cards -- I mean requests that we have not even finished

10 processing.  We're backed up.  That is the only way you can get

11 the cards from us.  The jurisdiction point of what we were

12 saying was --

13          THE COURT:  Mr. Myrick --

14          THE WITNESS:  Yeah.

15          THE COURT:  -- what cards are you referring to?

16          THE WITNESS:  The -- the cards are the -- the

17 discount -- we have discount prescription cards.  We built a

18 network and a program, and we found the best programs that

19 could help --

20          THE COURT:  So you're telling me that CHRISTUS

21 Santa Rosa authorized you to use their logo and their

22 identification in your advertisements; is that what you're --

23          THE WITNESS:  No --

24          THE COURT:  -- telling me?

25          THE WITNESS:  -- no -- no.

1       THE COURT:  I'm just asking you.

2       THE WITNESS:  Yes.

3       THE COURT:  You're telling me they --

4       THE WITNESS:  When they -- when -- when they --

5       THE COURT:  No --

6       THE WITNESS:  Yeah?

7       THE COURT:  -- just answer my question --

8       THE WITNESS:  Okay.

9       THE COURT:  -- yes or no, Mr. Myrick.

10      Did CHRISTUS Santa Rosa, or any of its affiliates,

11  authorize you to use their logo or their identifying

12  information in your advertisements or your web publications?

13  Yes or no?

14      THE WITNESS:  No.

15      THE COURT:  All right.

16      THE WITNESS:  But we follow --

17      THE COURT:  You answered the question.

18      THE WITNESS:  What I was going to say is that we

19  followed the -- the exception of the copyright, the copyright

20  exception of us -- and everybody keeps thinking that when we're

21  doing those videos, those videos are not advertisements.

22  They're thank you and informational videos for our clientele.

23  We work with almost 50,000 organizations plugged in.  And the

24  inner city that needs to know the information, where they can

25  get help, we inform them.  In the information -- that is one of

the things in the Congressional Black Caucus points where they
asked me to come in, it was talking about disparity.  Believe
it or not --

        THE COURT:  I am not interested in what you discussed
with third parties, including the Congressional Black Caucus.
That has nothing to do with this case.  What this has to do
with this case is the issue of your either being or not being
in violation of this Court's injunction.

        THE WITNESS:  Well, as far as the injunction --

        THE COURT:  There's only --

        THE WITNESS:  Okay.

        THE COURT:  -- there is -- there is one way and one
way only for this injunction to be overturned, and that is at
the Fifth Circuit Court of Appeals.  Do you understand?  Not by
any third party.  And until it is overturned, you are bound by
law to follow it.

        THE WITNESS:  Your Honor, I have no problem pulling
the videos.

        THE COURT:  Okay.

        THE WITNESS:  The -- the point, what everybody is
failing to understand --

        THE COURT:  Okay.  Why don't you step down.  You can
go over there.

        THE WITNESS:  Okay.

            (Witness excused from witness stand.)

 1          THE COURT:  Now, let me just hear argument first

 2     from -- do you have anything to add here?

 3          MR. COLLIER:  I -- I would say, very briefly,

 4     Your Honor, and I think the Court understands, we have been

 5     pursuing this since 2012.  We sent a cease and desist letter

 6     that, if you look at the bottom, all we asked him to do is sign

 7     it and send it back that he was going to pull it down.  We

 8     weren't suing.  We weren't doing anything.  We are a Catholic

 9     Nonprofit Healthcare System for San Antonio.  Our mission is to

10     extend the healing ministry of Jesus Christ.  It is very

11     difficult for me to explain to my client how two years into

12     this, with really no defense, he -- he's admitted, under oath

13     today, that he had no authorization to use this.  We've spent

14     thousands of dollars trying to stop this.

15          It is, and I can complete the presentation, but I don't

16     think I need to because he's admitted, it's still up on the

17     third-party sites.  I can still run a search on the defendant's

18     own website, and it's there.  And his response to the series of

19     court orders is, I don't have to do it because I've got some

20     lawyer in Georgia who's not authorized to practice here who

21     says it's problematic, and I can make CHRISTUS come to Georgia.

22          This is the epitome -- if we were to look up civil

23     contempt, this is the epitome of civil contempt and thumbing

24     his nose at the Court.  We -- as you may recall, we had an

25     opportunity to seek damages for what he did, and we passed on

1  that because all we wanted was an injunction to stop.  The only

2  reason that there's even an attorneys' fees judgment against

3  him is because what we've had to do.

4      His answers are inconsistent.  But he's receiving revenue

5  in six figures from this scheme, and it's been admitted into

6  evidence.  But we've previously presented -- and this is

7  today's website at AmericanConsultantsRX.com, the place where

8  we get led from his affiliation with CHRISTUS Health that he's

9  going to make money off the sale of a beer garden girl adult

10 women's plus size custom.

11     Now, I don't have anything against beer garden girls, but

12 that's not --

13          THE COURT:  Where is the -- where is the CHRISTUS

14 Santa Rosa indication there?

15          MR. COLLIER:  We can do a search.  The way you get to

16 this website is through his Tweets and his linking of ACRX, if

17 you'll look at the top, Your Honor --

18          THE COURT:  Yeah.

19          MR. COLLIER:  -- American Consultants RX, and this is

20 the website with today's advertisement.  I pulled it up on the

21 way to the courthouse.  We had already submitted, you know, his

22 selling of sort of adult-themed merchandise in our verified

23 complaint.  But just today, when you get pulled here due to his

24 failure to remove the so-called partnership between the two of

25 us, where he's using our trademarks, this is where people land.

1    And it's a flagrant thumbing the nose at the Court, and the

2    dignity of the Court, and I would -- we've not asked for

3    criminal contempt.  He is -- what he's done is he's monetized

4    the use and abuse of our and other entities' trademarks.

5    Though I don't represent them, he's Tweeting 500,000 times on

6    the Tweet that we -- we've pulled up with him as a -- as a

7    witness.  Sorry.  I have to too many -- too many blocks open,

8    Your Honor.  There we go.

9         The Tweet *[sic]* account -- he's got numerous.  He has sent

10   534,000 Tweets, 7200 videos, 1200 followers, and what he's

11   doing, while his answers are inconsistent as to how much he

12   makes, he's sitting back and raking in revenue, which is why he

13   won't stop and why had he won't honor the Court because he

14   links his abuse of everyone's trademarks in search queries and

15   poor people who want to find ways to save money at the

16   pharmacy, and he monetizes it for his own good.

17        So I would respectfully suggest to the Court that he's

18   indicated -- quite frankly, he's in civil contempt because he

19   thinks it's a fraudulent order.  He's referenced in his

20   pleading that the Court is the enforcement arm of fraud, and

21   that he can just go back to Georgia and do whatever.  I

22   don't -- I don't think even setting apart CHRISTUS and CHRISTUS

23   Santa Rosa's and the community's needs that the Court ought to

24   abide by that, and I think Mr. Myrick ought to be, as we had

25   requested, retained into custody.

1    I am very sure, from my experience, that the U.S. Marshals

2    are very capable of providing him supervised internet access,

3    and he can do what the Court has finally instructed -- or he

4    can finally do what the Court instructed him to do months ago

5    which is remove the infringing material, notify third parties,

6    notify YouTube.  They are so used to receiving DMCA requests,

7    Your Honor.  I don't know how long it will take.  But however

8    long it takes, he should be here until it's gone because he's

9    had six months to do it and decided not to do it until you

10   forced him to be here.

11       Thank you, Your Honor.

12           THE COURT:  All right.  Mr. Myrick?

13           DEFENDANT CHARLES MYRICK:  Judge, there -- there is

14   no such thing as me thumbing my nose to the -- to the Court.

15   Not only did I write this, because I wasn't going -- I was

16   going to be here.  There's no thumbing my nose.  I didn't thumb

17   my nose at anything that has happened to me in the past, and it

18   is not happening even with you.  The clarification was there

19   were things I didn't know what was going on.  As you heard me

20   right here say, I will take it down.  I didn't know some of

21   these things.  Some things weren't told to me.  I have an

22   attorney.  I didn't know he --

23           THE COURT:  Well, I -- you know, I don't know whether

24   you have an attorney or not.  You may use an attorney's name

25   but --

1          DEFENDANT CHARLES MYRICK:  No, I have a --

2          THE COURT:  -- the attorney --

3      Mr. Myrick, at this point, if I were you, I wouldn't

4  interrupt the Court.

5      Your attorney refused service.  He refused to acknowledge

6  you.  Do you understand?  So, under those circumstances, if you

7  have an attorney, it appears to be a one-way relationship.

8          DEFENDANT CHARLES MYRICK:  Well, I see that now.

9  I -- I did didn't know.  I -- I did not know that the

10  attorney --

11          THE COURT:  Well --

12          DEFENDANT CHARLES MYRICK:  -- was not doing his job.

13          THE COURT:  -- then you need to be talking to some --

14  that attorney or some other attorney; do you understand?

15          DEFENDANT CHARLES MYRICK:  I know.  When I get back,

16  I will.

17          THE COURT:  All right.  Well, you're assuming you're

18  going anywhere, Mr. Myrick.

19          DEFENDANT CHARLES MYRICK:  I'm assuming.

20          THE COURT:  All right.

21          DEFENDANT CHARLES MYRICK:  Judge --

22          THE COURT:  First of all -- no, I think the Court has

23  heard enough, Mr. Myrick.

24          DEFENDANT CHARLES MYRICK:  Oh, no.  No.  I wasn't --

25  Judge, I wasn't -- I'm saying this --

1          THE COURT:  Mr. Myrick --

2          DEFENDANT CHARLES MYRICK:  -- I will remove -- I'll

3    remove --

4          THE COURT:  No --

5          DEFENDANT CHARLES MYRICK:  -- I will remove

6    everything.

7          THE COURT:  Listen to me.  All right.  First of all,

8    predicated on the evidence before the Court, including your own

9    sworn admission, the Court finds you in civil contempt.

10        I am going to give you five days from today to remove each

11   and every single reference to CHRISTUS Santa Rosa, or any of

12   its affiliates, as laid out in the permanent injunction, and

13   I'm going to order another copy be provided to you today.

14   Every single dictate in this permanent injunction must be

15   complied with in five days.

16        Mr. Myrick, I want to have you be very clear on something.

17   I don't care whether you're in Georgia or Maine or California

18   or Hawaii or Alaska.  This is a United States District Court.

19   Do you understand that?

20        DEFENDANT CHARLES MYRICK:  Yes, sir.

21        THE COURT:  The Court's jurisdiction over you extends

22   throughout this great nation.  The fact that you may be in

23   Georgia, because you did business here, because you used the

24   name improperly and the copyright improperly of this

25   organization, you gave this Court jurisdiction.  So it makes no

1  difference where you are conducting your activities.  Do you

2  understand me?

3        DEFENDANT CHARLES MYRICK:  Yes, sir.

4        THE COURT:  And this suggestion that somehow there's

5  a fraud here, I don't know where the fraud is, but I can assure

6  you, if there is a fraud, it isn't coming from the plaintiff in

7  this case.

8        Now, I don't know what you're doing.  I don't know what

9  your business model is.  Quite frankly, I -- I suspect that if

10  fully advised of what you're doing, it might be fodder for the

11  Attorney General of the State of Georgia or the Department of

12  Justice.  Maybe they need to look into it.  But that's not my

13  job here.  That's not my role.  I'm not a prosecutor, and I'm

14  not an arm of the Department of Justice.  But what I do have is

15  a singular and important responsibility, and that is to see

16  that orders, which this Court issues, which are lawful and

17  which bear the imprimatur of the Court's authority are carried

18  out and not ignored and disregarded.  Both of which you have

19  done.

20        Make no mistake about it, Mr. Myrick, if I do not have

21  written acknowledgement by you, signed and notarized and filed

22  in this Court in five days acknowledging that you have removed

23  CHRISTUS Santa Rosa, and all of the other named related

24  entities, from any and all communications, including the

25  internet, Tweets, and other sources that you use, and that you

1  will never use them again, I will find you in criminal

2  contempt.  I will issue a bench warrant for your arrest.  You

3  will be brought back here.

4      At that point, if you don't have a lawyer, I will appoint

5  a federal defender, and you will stand trial for criminal

6  contempt which could result in a significant federal prison

7  sentence.  Do you understand me?

8              DEFENDANT CHARLES MYRICK:  Yes, sir.

9              THE COURT:  Do you think I am kidding?

10             DEFENDANT CHARLES MYRICK:  No, sir.

11             THE COURT:  Please understand me, Mr. Myrick, I am

12 not.  If I were you, I would disavow myself of any notions you

13 may have that somehow when you return to Georgia you are

14 somehow a sovereign individual who is no longer responsible

15 because of your notions of fraudulent intent or fraudulent

16 judgments or all of this other nonsense that you have placed

17 before the Court.  You did not appear.  A judgment was entered.

18 The appropriate thing to do within the appropriate time period,

19 which, by the way, has passed, would have been to file an

20 appeal.  You did not file an appeal.  The judgment is final and

21 enforceable.  That's it.  The time to contest it is over.

22     So now we have an injunction in place.  You've

23 acknowledged that you were in violation of that injunction.

24 Counsel wants me to hold you in custody today.  I am not going

25 to do that.  I could do it, but I'm not going to do it.  I'm

1  going to give you the benefit of getting back home to Georgia

2  and doing exactly what I told you to do, and then I am going to

3  require, as I just have told you, and I will tell you again so

4  that there is absolutely no mistake about it, I want you to

5  file with this Court a signed, notarized declaration under

6  penalty of perjury that you have complied with this Court's

7  injunction in every respect and that you will no longer use the

8  prohibited trademarked names in any of your activities.  And

9  that had best be done within five days.

10       And so that means I want it filed with this Court -- I

11  will give you -- because we have a holiday, I will give you

12  until Monday, September the 8th.  So that really is more than

13  five days.  Now do you agree to that, Mr. Myrick?

14            DEFENDANT CHARLES MYRICK:  Yes, sir.

15            THE COURT:  All right.  So you're going to be able to

16  get back in your car and go back to Georgia.  I'm going to

17  require that another copy of this injunction be given to you.

18  Is there any doubt in your mind, do you have any confusion

19  about what I just told you you must do?

20            DEFENDANT CHARLES MYRICK:  No, sir, I -- from the

21  point, we will -- we will go through every site that we have to

22  make sure that we can pull those --

23            THE COURT:  Well, not only that, you not only have to

24  do it, you have to file a signed --

25            DEFENDANT CHARLES MYRICK:  Right.

1    THE COURT:  -- notarized affidavit with this Court,

2   provide a copy to counsel, indicating that you have done just

3   that, and that you will no longer engage in the activities

4   prohibited by the injunction.  And that has to be done before a

5   notary pubic under penalty of perjury, and it must be filed on

6   or before the 8th of September at 4:00 p.m. Central Standard

7   Time.

8       Mr. Myrick, if the morning of the 9th of September comes

9   around, and my courtroom deputy tells me that I do not have

10  that in hand, I will issue a bench warrant for your arrest.

11          DEFENDANT CHARLES MYRICK:  I have a question --

12          THE COURT:  Mr. Myrick, do you see -- I want you to

13  turn around.  Turn around.  Do you see the gentlemen who are

14  standing here --

15      Stand up.

16      Do you see those two gentlemen?  They are Deputy

17  United States Marshals.  Do you know why they're here?

18          DEFENDANT CHARLES MYRICK:  I pretty much can figure

19  it, yes.

20          THE COURT:  Yeah.  Okay.  Well, gentlemen just like

21  them, their counterparts in Atlanta, are alerted.  Under their

22  supervision, those gentlemen are going to come visit you on the

23  9th or the 10th of September if you don't file what you need to

24  file and comply with this Court's injunction.  Do you

25  understand?

1          DEFENDANT CHARLES MYRICK:  Yes, sir.  I have no

2     problem.

3          THE COURT:  All right.  I am being quite lenient with

4     you, Mr. Myrick.  Because, quite frankly, I have the authority

5     to find you in contempt, and I did, but to enforce that

6     contempt today.

7          DEFENDANT CHARLES MYRICK:  I agree, sir.  It will be

8     definitely taken care of.

9          THE COURT:  All right.  Thank you very much

10    gentlemen.

11        Anything else?

12         MR. COLLIER:  No, Your Honor.  A minor request, if --

13    if either we or Mr. Myrick might leave first so we're not

14    riding the elevator down together.  It's been --

15         THE COURT:  All right.

16         MR. COLLIER:  -- a very emotional hearing.

17         THE COURT:  I will ask the deputy marshals to escort

18    Mr. Myrick out of the building.

19        You go with them right now, Mr. Myrick.

20         DEFENDANT CHARLES MYRICK:  Okay.

21         COURTROOM DEPUTY:  Do you want him to get a copy of

22    the permanent injunction?

23         THE COURT:  Yeah, he needs to get a copy of the

24    permanent injunction.  Do we have a copy?

25         COURTROOM DEPUTY:  I'm getting it.

1       THE COURT: She's making -- she's going to make a

2 copy for you again, Mr. Myrick. And you've acknowledged you

3 already have it, but we'll get you another copy.

4       DEFENDANT CHARLES MYRICK: And in order for me to

5 send it, do I send it -- I'm just asking, do I overnight it to

6 you? Do I overnight it to the Court?

7       THE COURT: Just overnight it to -- send it overnight

8 copy to counsel. You have his address. And you send a copy to

9 the -- to my chambers right here.

10       DEFENDANT CHARLES MYRICK: Okay.

11       THE COURT: And if you need that address, you can

12 always call and get it, or the marshals will give you our

13 address. All right.

14       DEFENDANT CHARLES MYRICK: Okay. No problem. Thank

15 you, sir.

16       THE COURT: All right.

17       MR. COLLIER: Thank you, Your Honor.

18       THE COURT: Okay. Anything else?

19       MR. COLLIER: No, Your Honor.

20       THE COURT: All right. The court stands in recess.

21       COURT SECURITY OFFICER: All rise.

22       (Whereupon said show cause hearing proceedings

23 concluded.)

24

25

# C E R T I F I C A T E

I, Kristin M. Anderson, a Registered Professional Reporter, and Official Court Reporter for the U.S. District Court, Western District of Texas do hereby certify:

That the foregoing is a true and correct transcript of the proceedings transcribed from my stenographic notes in the above-entitled matter;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

WITNESS my hand on this 5th day of September, 2014.


_/s/ Kristin M Anderson_
Kristin M. Anderson, RPR
United States Court Reporter
655 E. Cesar E. Chavez Blvd.
San Antonio, TX 78206